# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:11cr 50

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM AND** |
| Vs. | ) | **RECOMMENDATION** |
| | ) | |
| LIZET VASQUEZ HERNANDEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon defendant's "Motion to Suppress Evidence" (#23). The government responded to the motion with the "Government's Response to Defendant's Motion to Suppress Evidence"(#27). The undersigned conducted a hearing and heard evidence from the government and defendant on January 3, 2012. Thereafter, defendant filed a document entitled "Supplemental Memorandum in Support of Motion to Suppress Evidence" (#29) to which the government responded (#30). Having carefully considered the motion, response, supplemental memorandum and response and the record, including the testimony offered during the hearing, the Court enters the following findings, conclusions and recommendations.

## FINDINGS AND CONCLUSIONS

### I.     Procedural Background

Defendant is charged in a one-count bill of indictment that alleges on June 20, 2011, defendant, being an alien, was found in the United States after she had been deported subsequent to a conviction for the commission of an aggravated felony in violation of 8 U.S.C. § 1326(a) and (b)(2).  Defendant filed her "Motion to Suppress Evidence" (#23) on November 23, 2011.  The government filed its response (#27) on December 15, 2011.  A hearing was held on January 3, 2012.  On January 6, 2012, the defendant filed a "Supplemental Memorandum" (#29).  Attached to this pleading was a listing of cases for prosecutions for illegal reentry which have been filed in the United States District Court for the Western District of North Carolina (#29-1).  In this supplemental pleading, Defendant contends that, "[t]he overwhelming majority of illegal reentry prosecutions in this district relate to individuals of Hispanic origin." (#29, p. 6).  The Government filed a response (#30) to this supplemental pleading on January 29, 2012.

### II.     Factual Background

On December 2, 2010, an order was issued for the arrest of Carlos Ramirez-Ventura whose address was described as 422 Crest Road, Hendersonville, NC by a Henderson County North Carolina State Magistrate. (Transcript pp. 13-4.)  The

order alleged Ventura had failed to pay child support. (Transcript pp. 5-6.) On June 5, 2011, Paul Blackwell, Deputy with the Henderson County, North Carolina Sheriff's Office received a telephone call from a young lady. (Transcript p. 40.) The person told Deputy Blackwell that Mr. Ventura was no longer living at the 422 Crest Road address, but that he was living at 333 Clairmont, Hendersonville, North Carolina in a basement apartment with his girlfriend and their daughter. (Transcript pp. 40-1.) In the telephone call, Deputy Blackwell was informed Mr. Ventura was using a maroon colored truck. (Transcript p. 41.)

On June 7, 2011, at 10:00 a.m., Deputy Blackwell, along with Deputy Sheriff Vince Griggs and Deputy Sheriff Sam Seelig, all of the Henderson County, North Carolina Sheriff's Office, traveled to the residence located at 333 Clairmont to serve the order for arrest upon Mr. Ventura. (Transcript pp. 5-6, 9.) The dwelling house located at 333 Clairmont is a two story home with a finished apartment located in the basement of the home. (Transcript pp. 24-6.) A driveway leads from the street down to the entrance to the basement apartment, which also has the address of 333 Clairmont Drive. (Transcript p. 26.) When Deputy Griggs arrived at the dwelling, he drove his patrol vehicle from the street down the drive and parked behind a maroon truck. (Transcript pp. 26-27.) The patrol vehicle was located approximately fifteen to twenty feet from the door to the basement

apartment. (Transcript p. 27.) After exiting their patrol vehicles, Deputy Blackwell stood on the left side of the house, Deputy Seelig went to the right side of the house, and Deputy Griggs went to the basement apartment door of the dwelling. (Transcript pp. 6, 9-10.)

Deputy Griggs then knocked on the door to the basement apartment. The defendant Lizet Vasquez Harnandez answered the door. (Transcript p. 6.) Deputy Griggs asked defendant if she knew Ventura. The defendant told Deputy Griggs that she did not know Ventura. Deputy Griggs then left the entrance to the apartment and went back to report what he had learned to Deputy Blackwell. Deputy Blackwell instructed Deputy Griggs to pull up a photograph of Ventura on his laptop computer, go back to the apartment, and confirm that defendant did not know Ventura by showing her a photograph of Ventura. (Transcript p. 29.) Deputy Griggs then went to the door of the downstairs apartment with his laptop and showed a photograph of Ventura to defendant. (Transcript p. 30.) Defendant told Deputy Griggs that she did not know the person shown in the photograph. (Transcript p. 7.) Defendant also stated that she did not know who owned the maroon truck parked in the driveway. (Transcript pp. 7-8.) Deputy Griggs then returned to talk to Deputy Blackwell. (Transcript p. 9.)

Meanwhile, Deputy Blackwell checked with the Henderson County

communications center concerning the ownership registration for the license plate attached to the maroon truck. The truck came back registered to Ventura. (Transcript p. 41.) At that point, Deputy Seelig reported to Deputy Blackwell that there was a white van located on the other side of the dwelling house, which according to the Henderson County communications center was also owned by Ventura. (Transcript p. 42.)

While Deputy Griggs was showing the photograph of Ventura to the defendant, a neighbor called to Deputy Blackwell. Deputy Blackwell went over to the neighbor's home, whose porch overlooked the basement apartment of 333 Clairmont Drive. (Transcript p. 42.) Deputy Blackwell showed the neighbor a photograph of Ventura. (Transcript p. 42.) In response to being shown the photograph, the neighbor identified Ventura as the individual in the picture and stated that Ventura lived in the basement apartment of 333 Clairmont Drive. (Transcript pp. 42-3.) The neighbor also told Deputy Blackwell that the maroon truck and white van where either owned or operated by Ventura. Finally, the neighbor reported that Ventura lived in basement apartment with his girlfriend and their baby. (Transcript p. 43.)

At that point, Deputy Blackwell went back to the door of the basement apartment with Deputy Griggs to speak with defendant. (Transcript p. 43.) He

asked defendant who owned the maroon truck. Defendant responded that she did not know who owned the truck and did not know who lived upstairs. (Transcript p. 43.) Deputy Blackwell then called Lt. Tim Gordon and Lt. Walt Harper of the Henderson County Sheriff's Office to come to the scene. (Transcript pp. 43-4.)

After Deputy Blackwell explained the situation, Lt. Gordon and Deputy Blackwell went back to the basement apartment door to speak to defendant. (Transcript p. 44.) Lt. Gordon asked defendant again if she knew Carlos Ventura and where they could find him. (Transcript p. 44.) Again, defendant denied knowing Ventura and denied knowing who owned the maroon truck. (Transcript p. 44.) Lt. Gordon asked the defendant: "So you're telling us that Mr. Carlos Ventura, this man, is not here, he doesn't live here, and he is not here right now?" The defendant responded, "No." (Transcript p. 44.)

Lt. Gordon then asked defendant for permission to look in the apartment for Ventura. (Transcript p. 44.) The defendant replied, "No, no, not at all." Defendant then stepped to the side and invited the officers in with a wave of her hand. The defendant told the officers, "Come in and look. No one's here." (Transcript p. 44.) At this point in the discussion, defendant showed Deputy Blackwell an identification card with a name. (Transcript p. 45.)

As Lt. Gordon and Deputy Blackwell looked through the home, they found a

photograph on an end table in the living room that showed defendant with Ventura. (Transcript p. 45.)  Deputy Blackwell confronted defendant with the photograph, and asked her again if she knew Ventura.  (Transcript p. 46.)  The defendant again denied knowing Ventura.  (Transcript p. 46.)  Deputy Blackwell then picked up the photograph and asked defendant to identify the individuals depicted in the photograph.  (Transcript p. 46.)  Defendant responded: "that's my deceased sister with Carlos."  (Transcript p. 46.)  Deputy Blackwell then asked defendant: "I thought you said you didn't know Carlos?"  (Transcript p. 46.)  The defendant responded: "Well I do, but that's not me; that is my deceased twin sister." (Transcript p. 46.)

 Deputy Blackwell then asked defendant if she was an illegal alien, to which defendant responded that she was illegally in this country.  (Transcript p. 47.) Deputy Blackwell also  asked defendant if she knew that if he arrested her she would be deported.   Defendant responded that she was not lying to Deputy Blackwell.  (Transcript pp. 47-48.)  Deputy Blackwell told defendant if he found out she was not telling him the truth he would arrest her and charge her with resisting and obstructing the officers.  (transcript p. 56)

Deputy Blackwell testified that to the best of his knowledge, Henderson County does not have any policies concerning whether officers are allowed to ask

persons their immigration status.  (Transcript p. 63.) He further testified that it is a policy of the Henderson County Sheriff's Office that if someone continuously deceives an officer to the point they are delayed, then the person is charged with resisting, obstructing, and delaying an officer.  (Transcript p. 58.)  Deputy Blackwell asked defendant her immigration status because he believed defendant was lying to him and wanted her to understand how serious the situation was if she were arrested for resisting, obstructing, and delaying the officers.  (Transcript p. 68.)

Deputy Blackwell and Lt. Gordon then exited the apartment, walked up the driveway, and found Deputy Griggs and Lt. Harper speaking to Mr. Edgar Cruz, who had arrived at the scene.  (Transcript p. 48.)  Cruz, who first denied knowing Ventura, subsequently acknowledged that he knew Ventura, who was his brother-in-law.  (Transcript pp. 48, 74-5.)  Cruz told the officers that defendant was Ventura's girlfriend, and that they lived together in the downstairs apartment. (Transcript p. 34.)

Shortly thereafter, Ventura's mother arrived at the dwelling.  (Transcript pp. 34-5.)  Cruz acted as an interpreter with the mother, who consented to the search of the upstairs portion of the dwelling.  (Transcript pp. 34-5.)  Deputy Blackwell believed Ventura was located somewhere in the residence.  (Transcript pp. 57-8.)

Cruz then used Ventura's mother's cellular telephone to contact Ventura. (Transcript pp. 81, 84.) Cruz gave the phone to Deputy Griggs, who told Ventura that he needed to go to the Henderson County Magistrate's Office and surrender himself for service of the order for arrest. (Transcript pp. 12, 35-36, 81.) Deputy Blackwell subsequently called the Henderson County Jail and confirmed that Ventura had surrendered himself. (Transcript p. 49.) Deputy Blackwell and Deputy Seelig then went to the entrance to the basement apartment, talked to defendant, and arrested her for obstructing and delaying the officers due to the fact the officers had been delayed for over two hours in attempting to serve the order for arrest upon Ventura. (Transcript p. 50.)

During the process of arrest, Deputy Blackwell placed defendant in custody and put her in his patrol car. (Transcript p. 50.) At no time, either before or after the arrest, did Deputy Blackwell advise defendant of the warnings as set forth in Miranda v. Arizona, 384 U.S. 436 (1966). (Transcript pp. 70-1.) The defendant had in her possession a small purse, and at some point she produced to Deputy Blackwell a permanent resident alien identification card. (Transcript p. 50.) As Deputy Blackwell parked his vehicle near the entrance to the Henderson County Jail, he asked defendant: "Is this your I.D.?." (Transcript p. 50.) Defendant responded "Yes, but that's fake." (Transcript p.50.) Deputy Blackwell then took

the defendant to the booking room in the jail, where he saw Federal Immigration Agent Christine Debloski at the counter.  (Transcript p. 51.)  Deputy Blackwell showed the identification card to Agent Debloski and asked her if it was a fake identification card.  (Transcript p. 51.)  Agent Debloski looked at the card and confirmed that the card was a fake.  (Transcript p. 51.)  Deputy Blackwell then processed an arrest warrant for defendant charging her with resisting and obstructing the officers. (Transcript p. 52.)  As he was doing so, Agent Debloski came into the room and told Deputy Blackwell not only was the defendant illegally in the United States but she was: "aggravated reentry illegal." (Transcript pp. 51-52.)  Deputy Blackwell, however, testified that he did not arrest defendant because of her immigration status; he arrested her because she had delayed the officers in their warrant service.  (Transcript p. 59.)  The District Attorney's Office for Henderson County dismissed the charges against defendant for resisting an officer on June 14, 2011.  (Transcript pp. 22-23; Def's Exhibit D-1.)

## III.    Discussion

In defendant's initial Motion to Suppress (#23), defendant requests that the Court exclude evidence pursuant to the Fourth Amendment to the United States Constitution because of defendant's alleged unlawful arrest.  In the Supplemental Memorandum (#29), defendant requests that the Court exclude evidence pursuant

to the Fifth and Fourteenth Amendments to the United States Constitution.

**A.    Defendant's Arrest was Lawful**

Defendant contends she could not be arrested in her home without a warrant being issued prior to her arrest and seizure.  As authority for this position defendant cites <u>Payton v. New York</u>, 445 U.S. 570 (1980) and <u>Groh v. Ramirez</u>, 540 U.S. 551 (2004).  Defendant's argument and reliance on these cases is misplaced.

    In <u>Payton</u> the Supreme Court held that the Fourth Amendment prohibits police officers from making a warrantless, nonconsensual entry into a suspect's home in order to make a routine felony arrest.  <u>Payton</u>, however, does not support defendant's motion.  In this case, the deputies came to the apartment where defendant lived to arrest Ventura, not defendant.  The officers arrested defendant only *after* she committed a criminal offense in their presence while they were attempting to execute an arrest warrant for Ventura.  Federal law allows for the warrantless arrest of a person when a law enforcement officer has probable cause to believe the person has committed a criminal offense in the officer's presence.  <u>See</u> <u>Virginia v. Moore</u>, 553 U.S. 164 (2008); <u>Devenpeck v. Alford</u>, 543 U.S. 146 (2004); <u>Atwater v. City of Logo Visa</u>, 532 U.S. 318 (2001); <u>Figg v. Schroeder</u>, 312 F.3d 625 (4th Cir. 2002) .  The same is true under North Carolina law.  <u>See</u> N.C.

Gen. Stat. §15A-401(b)(1).

Upon a review of the facts in this case, it is clear that the officers had probable cause to believe that Defendant committed a crime in their presence. The officers subjectively believed that a crime was being committed and had probable cause to arrest Defendant for violating N.C. Gen. Stat. §14-223, which provides that: "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor." See also State v. Sinclair, 191 N.C.App. 484, 488-89, 663 S.E.2d 866, 870 (2008) (outlining the elements of an offense under Section 14-223). Here, defendant knew that the individuals at the apartment were public officers who were attempting to discharge the duty of their office by serving an order for arrest upon Ventura. Defendant delayed and obstructed the five deputies for almost two hours by repeatedly lying to them concerning her knowledge of Ventura. The record demonstrates that defendant acted willfully, intentionally and unlawfully in obstructing and delaying the officers. In fact, Defendant did so despite repeated warnings from Deputy Blackwell concerning the consequences of her conduct. All of these acts were committed in the presence of one or more of the deputies present. Accordingly, the officers had probable cause for the arrest of Defendant and her arrest did not

violate the Fourth Amendment.

**B.    The Entry into Defendant's Home was Lawful**

Defendant contends that there no exigent circumstances justifying the entrance into her home by the deputy sheriffs.  While Defendant may be correct that no exigent circumstanced existed, the officers do not need exigent circumstances to justify the search if defendant voluntarily consented to the search of her home.  Accordingly, the pertinent question for the Court is whether defendant's consent to search of her home was voluntary.  As the Eastern District of Virginia explained in United States v. Tyson, 360 F.Supp. 2d 798, 805 (E.D.Va. 2005):

> In determining whether a defendant's consent was voluntary, the critical inquiry is whether a defendant's consent to search was his own "essentially free and unconstrained choice" or whether his will was "overborne and his capacity for self-determination critically impaired." *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 46 L.Ed.2d 598 (1976) (*quoting Schneckloth*, 412 U.S. at 219, 93 S. Ct. 2041). This inquiry is based on an examination of the totality of the circumstances. *See Schneckloth*, 412 U.S. at 223-34, 93 S. Ct. 2041; *Boone*, 245 F.3d at 361; *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir.1996). In assessing the totality of the circumstances, appropriate factors to consider include the characteristics of the accused (such as his age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). *Lattimore*, 87 F.3d at 650. While it is a relevant factor in the voluntariness inquiry that the defendant knew of his right to refuse consent, the government need not establish that the defendant knew of his right to refuse to prove that consent

was voluntary. *Boone*, 245 F.3d at 362; *United States v. Brugal*, 209 F.3d 353, 362 (4th Cir.2000). Additionally, consent given while in custody may still be voluntary so long as the totality of the circumstances confirms that the consent was not coerced. *Boone*, 245 F.3d at 362-63 (*citing Watson*, 423 U.S. at 424, 96 S. Ct. 820).

Based on the totality of the circumstances, defendant's consent was voluntary. When defendant was asked by Lt. Gordon for permission to look for Ventura in defendant's apartment, defendant stated, "No, no, come in and look. No one is home." (Transcript p. 44.)  Defendant also waved her hand indicating that the officers could go into the apartment and search for Ventura.  (Transcript p.44.)   In considering voluntariness based on a totality of the circumstances, the Court has considered the characteristics of the accused, including her age, maturity, education, intelligence and experience, to the extend that such evidence is in the record.  Defendant, who was 32 years old at the time,  appeared to understand what was happening,  spoke English, was left in charge of her own child, and she was polite with the officers.  Defendant has not alleged or argued that she suffered from any disability at the time she gave consent to the search.   In addition, Defendant continued to give false statements to the officers, indicating that she was not intimidated by the officers.  Thus, the characteristics of this defendant do not raise any concerns with the Court as to her ability to understand the nature

and consequences of her consent or any concerns with her ability to simply refuse to allow the officers to search the home.

As to the conduct of the officers, the officers were dressed in uniform and there was no display of firearms. Little pressure was exerted on defendant in obtaining the consent to search the apartment. The discussions between defendant and the officers were civil and cordial until the discovery of the photograph during the search. At that point, defendant was asked about her immigration status and was told clearly the consequences of what could happen if she obstructed and delayed the officers. This event, however, occurred after defendant had given consent to search. In this case, all the circumstances show that defendant voluntarily consented to the entry into her apartment and voluntarily consented to answer the questions of the officers.

**C.  The Issues Raised by Defendant Regarding the Arrest Warrant are Meritless**

Defendant, relying on <u>United States v. Hill</u>, 649 F.3d 258 (4th Cir. 2011), contends that the officers must, absent a search warrant, have sufficient reasons upon which to believe that a subject is home before they can attempt an arrest of a defendant at his home. <u>Hill</u> has no bearing on this case. As a threshold matter, defendant was not the subject of the arrest warrant. The subject was Ventura. Moreover, defendant voluntarily consented to the search of her apartment. Put

simply, Hill does not provide any basis for Defendant to challenge either her arrest or the entry into her home.

Next, Defendant contends that a validly issued order for arrest of a potential defendant for a violation of North Carolina law must be served within fourteen days after its issuance and the officers delivering a copy of the order for arrest for Ventura must serve a copy on defendant.   In support of her position, Defendant relies on  Rule 41 of the Federal Rules of Criminal Procedure.  Rule 41, however, applies to search warrants and seizure warrants, not arrest warrants.  Fed. R. Crim. P. 41(e)(A)(i).  Moreover, the order for arrest for Ventura was part of a state proceeding.  Rule 41 applies to criminal proceedings in the United States District Court, not to state proceedings.  See  United States v. Claridy, 601 F.3d 276 (4th Cir. 2010).  The applicable state law concerning the execution of the order for arrest for Ventura is N.C. Gen. Stat. § 15A-301(d)(2)(3), which states:

> If criminal process that was created and exists only in paper form is not served or executed within a number of days indicated below, it must be returned to the clerk of court in the county in which it was issued, with a reason for the failure of service or execution noted thereon.
> a.    Warrant for arrest — 180 days
> b.    Order for arrest — 180 days
> c.    Criminal summons — 90 days or the date the defendant is directed  to appear, whichever is earlier.
>
> Failure to return the process to the clerk as required by subdivision (2) of this subsection does not invalidate the process, nor does it

invalidate service or execution made after the period specified in subdivision (2).

The warrant for Ventura was issued on December 2, 2010 (#23-2). The arrest of Ventura occurred on June 7, 2010. 188 days had passed since the issuance of the order for arrest for Ventura, which is in excess of the 180 days within which the order for arrest is to be returned citing a reason for failure of service. However, failure to return the order for arrest does not invalidate it or its service or execution after the period specified in the statute. Moreover, the law did not require the officers to provide defendant with a copy of the order for arrest. Finally, defendant was not the subject of the Ventura order for arrest. She has no standing to raise the timing of its service or any other potential technical errors in its execution.

### D.   No Selective Prosecution or Enforcement Occurred

Defendant contends in her Supplemental Memorandum to Suppress that her arrest was based upon selective enforcement of the law based upon defendant's race; that being Hispanic. Defendant then changed her contention to contend she was subject to selective prosecution based upon her immigration status. (#29-6) In summary, defendant has presented separate contentions jointly in the same argument without recognizing the difference between selective enforcement and

selective prosecution or the difference between discrimination based upon race

compared to discrimination based upon immigration status.    Neither argument,

however, has any merit.

In United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006)

the Court of Appeals for the Tenth Circuit described the elements of the defense of

selective enforcement of the law:

> The Constitution prohibits selective enforcement of the law based on
> considerations such as race.  Whren v. United States, 517 U.S. 806,
> 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see* Wayte v. United
> States, 470 U.S. 598, 608 n. 9, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)
> (ban on discriminatory law enforcement applied to the federal
> government under the Fifth Amendment).  Racially selective law
> enforcement violates this nation's constitutional values at the most
> fundamental level; indeed, unequal application of criminal law to
> white and black persons was one of the central evils addressed by the
> framers of the Fourteenth Amendment.  Marshall v. Columbia Lea
> Reg'l Hosp., 345 F.3d 1157, 1167 (10th Cir. 2003)
>
> The Supreme Court has held that a person making a selective-
> prosecution claim must establish two elements: [1] the federal
> prosecutorial policy had a discriminatory effect and [2] it was
> motivated by a discriminatory purpose.  Armstrong, 517 U.S. at 465,
> 116 S.Ct. 1480 (internal quotation marks omitted).  "To establish a
> discriminatory effect in a [*selective-prosecution*] race case, the
> claimant must show that similarly-situated individuals of a different
> race were not prosecuted." *Id.*  The elements are essentially the same
> for a *selective-enforcement* claim.  A defendant "challenging alleged
> racial discrimination in traffic stops and arrests must present evidence
> from which a jury could reasonably infer that the law enforcement
> officials involved were motivated by a discriminatory purpose and
> their actions had a discriminatory effect."  Marshall, 345 F.3d at 1168.

To satisfy the discriminatory-effect element, one who claims selective enforcement "must—make a credible showing that a similarly-situated individual of another race could have been, but was not, [stopped or] arrested—for the offense for which the defendant was [stopped or] arrested—" James, 357 F.3d at 1179.  And the discriminatory-purpose element requires a showing that discriminatory intent was a "motivating factor in the decision" to enforce the criminal law against the defendant.  Marshall, 345 F.3d at 1168.  Discriminatory intent can be shown by either direct or circumstantial evidence.  *See* United States v. Deberry, 430 F.3d 1294, 1299 (10th Cir. 2005).

The burden which must be met by defendant to establish a selective-prosecution claim is set forth in United States v. Armstrong, 517 U.S. 456, 463-465 (1996):

> A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.  Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one.  These cases afford a "background presumption," cf. United States v. Mezzanatto, 513 U.S. 196, 203, 115 S. Ct. 797, 803, 130 L.Ed.2d 697 1995) that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims.

> A selective-prosecution claim asks a court to exercise judicial power over a "special providence" of the Executive.  Heckler v. Chaney, 470 U.S. 821, 832, 105 S. Ct. 1649, 1656, 84 L.Ed.2d 714 (1985).  The Attorney General and United States Attorneys retain "broad discretion" to enforce the Nation's criminal laws.  Wayte v. United States, 470 U.S. 598, 607, 105 S. Ct. 1524, 1530-1531, 84 L.Ed.2d 547 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380, n. 11, 102 S. Ct. 2485, 2492, n. 11, 73 L.Ed.2d 74 (1982)).  They have this latitude because they are designated by statute as the President's

delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; *see* 28 U.S.C. §§ 516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15, 47 S. Ct. 1, 6, 71 L.Ed. 131 (1926). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L.Ed.2d 604 (1978).

Of course, a prosecutor's discretion is "subject to constitutional constraints." United States v. Batchelder, 442 U.S. 114, 125, 99 S.Ct. 2198, 2204-2205, 60 L.Ed.2d 755 (1979). One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 694-695, 98 L.Ed. 884 (1954), is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons—with a mind so unequal and oppressive" that the system of prosecution amounts to a "practical denial" of equal protection of the law. Yick Wo v. Hopkins, 118 U.S. 356, 373, 6 S. Ct. 1064, 1073, 30 L.Ed. 220 (1886).

In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." Chemical Foundation, *supra*, at 14-15, 47 S.Ct. At 6. We explained in Wayte why courts are "properly hesitant to examine the decision whether to prosecute." 470 U.S., at 608, 105 S.Ct., at 1531. Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's

enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id*., at 607, 105 S. Ct., at 1530. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Ibid*.

The requirements for a selective-prosecution claim draw on "ordinary equal protection standards." *Id*., at 608, 105 S.Ct., at 1531. The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Ibid*.; accord, <u>Oyler</u>, *supra*, at 456, 82 S. Ct., at 506. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted.


Defendant contends Deputy Blackwell asked defendant if she was an illegal alien because she was Hispanic and, thus, any resulting prosecution for any crime was unlawful. Deputy Blackwell, however, testified that he asked defendant the question to impress upon her the seriousness of her situation; that if she continued to lie to the officers and was arrested for delaying and obstructing the officers, she could be deported. Defendant was later arrested for obstructing and delaying the officers. The record is imply devoid of evidence of a discriminatory purpose behind the arrest of defendant or that their actions had a discriminatory effect. The evidence does not demonstrate that defendant was arrested because she was an

illegal alien or hispanic.

Defendant has not made a credible showing that a similarly-situated individual of another race could have been but was not arrested for the similar offense for which defendant was arrested. Although Defendant point to Cruz, a United States citizen, who was not arrested, Cruz cooperated with law enforcement. Defendant repeatedly lied to the officers after being provided multiple opportunities to tell the truth. After initially telling the officers he did not knowVentura, Cruz then admitted he did know Ventura, was related by marriage to Ventura, identified defendant as Ventura's girlfriend, and assisted law enforcement in obtaining Ventura's surrender at the county jail. Cruz did not commit a crime for which he could have been arrested. More importantly, Cruz is not of another race different than that of defendant; he is of Hispanic descent.

Finally, it was Blackwell's decision to arrest defendant and charge her with the crime of obstructing and delaying the officers. There is no evidence that it was Blackwell's decision to charge defendant with the federal crime with which she is presently charged, that being in violation of 8 U.S.C. § 1326(a) and (b)(2). Defendant has not pointed the Court to any evidence that Deputy Blackwell has arrested Hispanics to the exclusion of other races or that discriminatory intent was a motivating factor in his decision to arrest defendant for obstructing and delaying the officers. Accordingly, defendant's selective enforcement claim fails.

Similarly, defendant's selective prosecution claim fails. In support of her arguments, defendant has attached to her Supplemental Brief pages from the United States District Court for the Western District of North Carolina's electronic filing system. Defendant contends that the eleven prosecutions for illegal entry in the Asheville Division in 2011 all involved defendants with Hispanic names. She further contends that of the 75 prosecutions for illegal reentry in the Charlotte Division for 2011, "all but a handful similarly target defendants of Hispanic origin." (#29, p. 6.) The 2010 United States Sentencing Commission Report shows that 86.9% of immigration defendants were of Hispanic origin. (2010 United States Sentencing Guideline Report p. 35) Defendant's statistical presentation does not show that the United States Attorney for the Western District of North Carolina nor her assistants have prosecuted Hispanic persons in any way other than in the same manner as immigration cases are prosecuted throughout the United States. There has been no showing of any evidence that the office of the United States Attorney for the Western District of North Carolina decision to prosecute defendant was motivated by any discriminatory purpose nor that her actions had discriminatory effect. The defendant's contentions and arguments concerning selective enforcement and selective prosecution are both without basis.

**E.     The Statements Made by Defendant after her Arrest Should be Suppressed**

At the hearing, the Court raised the issue of whether the statements made by defendant after her arrest should be suppressed.   The warnings required by Miranda v. Arizona, 384 U.S. 436 (1966) are required when a subject  is interrogated while in custody.  The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances the "suspects freedom of action is curtailed to a degree associated with formal arrest."   Berkemer v. McCarty, 468 U.S. 420, 440 (1984).  Ordinary crime scene investigations nor noncustodial questioning of a witness or suspect does not require the Miranda warnings.  Oregon v. Mathiason, 429 U.S. 492 (1977).

The totality of the circumstances show defendant was not in custody when she answered Deputy Blackwell's questions concerning her immigration status inside of her apartment.  Defendant was free to leave; she was not in custody and she had not been arrested.  (Transcript pp. 71-2.)  The statements made by defendant in the patrol car and the identification card,  are subject to exclusion. After the arrest and at a point when defendant was in custody, Deputy Blackwell

testified:

> I took the defendant into custody and placed her in my patrol vehicle, and we had her–if I remember correctly, we had a pocketbook, or possibly a small purse, I can't remember exactly. I took her down. I had an I.D. It was a Permanent Resident–if I remember correctly it was a Permanent Resident Alien card. As we pulled into the sally port, I asked Mr. Vasquez, I said, "Is this your I.D.?" and she said, "yes, but that's fake." and I said, "what do you mean it's fake?" and I remember looking at it again and it appeared to be legitimate to me and she said, "yes, that's my I.D., but it's fake."

(Transcript p. 50.)

By the time the card was produced and defendant was being questioned, she had been arrested and she was in custody. Defendant was never advised of the Miranda warnings. The undersigned is of the opinion the response defendant made to the questions concerning the card should be excluded from evidence in this case. How Deputy Blackwell obtained the identification card was never explained at the hearing. No evidence was presented concerning if the Permanent Resident Alien was the same I.D. card defendant had shown Blackwell in her apartment. The government has not presented to the court any argument concerning any exception to the Fourth Amendment requirement for a search warrant. Warrantless searches are per se unreasonable absent consent or exigent circumstances. Coolidge v. New Hampshire, 403 U.S. 443 (1971). The government has not presented any argument the card was obtained pursuant to a search incident to a lawful arrest. Michigan v.

DeFillipo, 443 U.S. 31, 35 (1979), or as a result of any consent issued by defendant. The undersigned will recommend that the Permanent Resident Alien card be excluded from evidence in this matter and the statement made by defendant in response to Deputy Blackwell's questions in which she stated that the card was hers but it was fake, also be excluded.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendant's Motion to Suppress (#23) and defendant's Supplemental Memorandum in Support of Motion to Suppress (#29) be **DENIED**. It is further recommended that the court exclude from evidence the Permanent Resident Alien card and defendant's response to Deputy Blackwell's questions in which she stated the card was hers, but it was fake.

Signed: April 16, 2012

Dennis L. Howell
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).